**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| United States Department of Justice | ) |
| Antitrust Division | ) |
| 450 Fifth Street, N.W., Suite 8700 | ) |
| Washington, D.C. 20530 | ) |
| | ) |
| and | ) |
| | ) |
| STATE OF TEXAS | ) |
| Office of the Attorney General | ) |
| Consumer Protection Division | ) |
| Antitrust Section | ) |
| 300 W. 15th Street, 7th Floor | ) |
| Austin, TX 78701 | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| MARTIN MARIETTA MATERIALS, INC. | ) |
| 2710 Wycliff Road | ) |
| Raleigh, North Carolina 27607 | ) |
| | ) |
| and | ) |
| | ) |
| TEXAS INDUSTRIES, INC. | ) |
| 1503 LBJ Freeway, Suite 400 | ) |
| Dallas, Texas 75234 | ) |
| | ) |
| Defendants. | ) |

---

## COMPLAINT

Plaintiffs, the United States of America ("United States"), acting under the direction of

the Attorney General of the United States, and the State of Texas, acting by and through the

Attorney General of Texas, bring this civil antitrust action against Defendants Martin Marietta

Materials, Inc. ("Martin Marietta") to enjoin Martin Marietta's proposed acquisition of Texas

Industries, Inc. ("Texas Industries").  Plaintiffs complain and allege as follows:

## I.     INTRODUCTION

1.      On January 28, 2014, Martin Marietta and Texas Industries announced a

definitive merger agreement valued at approximately $2.7 billion.  The merger would create the

largest aggregate producer in the United States, with annual net sales of nearly $3 billion.

2.      The proposed acquisition would eliminate real and potential head-to-head

competition between Martin Marietta and Texas Industries on price and service in supplying

aggregate in the Dallas, Texas area.  For a significant number of customers in the Dallas area,

Martin Marietta and Texas Industries are two of the three best sources of Texas DOT-qualified

aggregate.  Elimination of competition between Martin Marietta and Texas Industries likely

would give Martin Marietta the ability to raise prices or decrease the quality of service provided

to these customers.  As a result, the proposed acquisition likely would substantially lessen

competition in the production and sale of aggregate in the Dallas area, in violation of Section 7

of the Clayton Act, 15 U.S.C. § 18.

## II.    THE PARTIES TO THE PROPOSED TRANSACTION

3.      Defendant Martin Marietta is incorporated in North Carolina with its headquarters

in Raleigh, North Carolina.  Martin Marietta produces, distributes, and/or markets aggregate for

the construction industry in 29 states.  Martin Marietta also produces aggregate in Nova Scotia,

Canada, and the Bahamas, which it distributes and sells at numerous terminals and yards along

the East Coast of the United States.  In 2013, Martin Marietta had net sales of $2.1 billion.

4.      Defendant Texas Industries is incorporated in Delaware with its headquarters in

Texas.  Texas Industries produces, distributes, and/or markets aggregate in five states; Texas,

Oklahoma, Louisiana, Arkansas and California.  Texas Industries also produces asphalt concrete,

ready mix concrete, and has significant cement production capabilities in California and Texas.

In 2013, Texas Industries had net sales of $800 million.

## III.   JURISDICTION AND VENUE

5.      The United States brings this action pursuant to Section 15 of the Clayton Act, 15

U.S.C. §§ 4 and 25, as amended, to prevent and restrain Defendants from violating Section 7 of

the Clayton Act, 15 U.S.C. § 18.

6.      The State of Texas brings this action under Section 16 of the Clayton Act, 15

U.S.C. § 26, to prevent and restrain Martin Marietta and Texas Industries from violating Section

7 of the Clayton Act, as amended, 15 U.S.C. § 18.  The State of Texas, by and through the

Attorney General of Texas, brings this action as *parens patriae* on behalf of the citizens, general

welfare, and economy of the State of Texas.

7.      Defendants produce and sell aggregate in the flow of interstate commerce.

Defendants' activity in the production and sale of aggregate substantially affects interstate

commerce.  The Court has subject matter jurisdiction over this action pursuant to Section 15 of

the Clayton Act, 15 U.S.C. § 25, and 28 U.S.C. §§ 1331, 1337(a), and 1345.

8.      Defendants have consented to venue and personal jurisdiction in this judicial

district.

## IV.   TRADE AND COMMERCE

### A.      Aggregate is an Essential Input for Many Construction Projects

9.      Aggregate is stone, produced at mines, quarries, and gravel pits, that is used for

construction projects and in various industrial processes.  The aggregate produced in quarries and

mines is predominantly limestone, granite, or trap rock.  Different types and sizes of rock are

3

needed to meet different specifications for use in asphalt concrete, ready mix concrete, industrial

processes, and other products.  Asphalt concrete consists of approximately 95 percent aggregate,

and ready mix concrete is made of up of approximately 75 percent aggregate.  Aggregate thus is

an integral input for road and other construction projects.

10.     The customer on each construction project establishes specifications that the

aggregate must meet for each application for which it is used.  State Departments of

Transportation ("state DOTs"), including the Texas DOT, set specifications for aggregate used to

produce asphalt concrete, ready mix concrete, and road base for state DOT projects.  State DOTs

specify characteristics such as hardness and durability, size, polish value, and a variety of other

characteristics.  The specifications are intended to ensure the longevity and safety of the projects

that use aggregate.

11.     For Texas DOT projects, the Texas DOT tests the aggregate to ensure that the

stone for an application meets proper specifications at the quarry before it is shipped, when the

aggregate is sent to the purchaser to produce an end product such as asphalt concrete, and often

after the end product has been produced.  In addition, the Texas DOT pre-qualifies quarries

according to the end uses for the aggregate.  Many city, county, and commercial entities in Texas

use the Texas DOT aggregate specifications when building roads, bridges, and parking lots to

optimize project longevity.

**B.     Transportation is a Significant Component of the Cost of Aggregate**

12.     Aggregate is priced by the ton and is a relatively inexpensive product.  Prices

range from approximately five to twenty dollars per ton.  A variety of approaches are used to

price aggregate.  For small volumes, aggregate often is sold according to a posted price.  For

4

larger volumes, customers either negotiate prices for a particular job or seek bids from multiple aggregate suppliers.

13.     In areas where aggregate is locally available, it is transported from quarries to customers by truck.  On a per-mile basis, trucking is the most expensive option for transporting aggregate over longer distances.

14.     Aggregate is also shipped by rail from quarries to yards.  It is then transported by truck from the yards to customers in the area.  The rail yards, which typically are supplied by quarries that are 100 to 200 miles away, frequently are large operations that can handle 75- to 100-car unit trains and are served by large quarries located on rail lines that have automated aggregate rail-loading operations.  Over longer distances, the cost of transporting aggregate by rail is significantly cheaper, on a per-mile basis, than by truck.

**C.     Relevant Markets**

**1.     Texas DOT-Qualified Aggregate is a Relevant Product Market**

15.     Within the broad category of aggregate, different types of stone are used for different purposes.  For instance, aggregate used as road base is not the same as aggregate used in asphalt concrete.  Accordingly, they are not interchangeable or substitutable for one another and demand for each is separate.  Thus, each type of aggregate likely is a separate line of commerce and a relevant product market within the meaning of Section 7 of the Clayton Act.

16.     Texas DOT-qualified aggregate is aggregate qualified by Texas DOT for use in road construction.  Aggregate that meets the standards for Texas DOT qualification differs from other aggregate in its size, physical composition, functional characteristics, customary uses, consistent availability, and pricing.  A customer whose job specifies Texas DOT-qualified aggregate cannot substitute non-Texas DOT-qualified aggregate or other materials.

17.     Although numerous narrower product markets exist, the competitive dynamic for each type of Texas DOT-qualified aggregate is nearly identical.  Therefore, they all may be combined for analytical convenience into a single relevant product market for the purpose of evaluating the competitive impact of the acquisition.

18.     A small but significant increase in the price of Texas DOT-qualified aggregate would not cause a sufficient number of customers to substitute to another type of aggregate or another material so as to make such a price increase unprofitable.  Accordingly, the production and sale of Texas DOT-qualified aggregate is a line of commerce and a relevant product market within the meaning of Section 7 of the Clayton Act.

### 2.     Dallas, Texas is a Relevant Geographic Market

19.     Aggregate is a relatively low-cost product that is bulky and heavy.  As a result, the cost of transporting aggregate is high compared to the value of the product.

20.     When customers seek price quotes or bids, the distance from the project site or plant location will have a considerable impact on the selection of a supplier, due to the high cost of transporting aggregate relative to the low value of the product.  Suppliers know the importance of transportation cost to a potential customer's selection of an aggregate supplier; they know the locations of their competitors, and they often will factor the cost of transportation from other suppliers into the price or bid that they submit.

21.     The primary factor that determines the area a supplier can serve is the location of competing quarries and rail yards.  When quoting prices or submitting bids, aggregate suppliers will account for the location of the project site or plant, the cost of transporting aggregate to the project site or plant, and the locations of the competitors that might bid on a job.  Therefore,

depending on the location of the project site or plant, suppliers are able to adjust their bids to account for the distance other competitors are from a job.

22.     The size of a geographic market also can depend on whether aggregate is being transported in an urban or rural setting and on specific characteristics of the road network. Where there are multiple quarries in a region, urban traffic congestion may greatly reduce the distance aggregate can be economically transported.  In such cases, geographic markets can be very small.  The closest quarry or rail yard to a customer also may have higher delivery costs than a more distant quarry because of local traffic patterns that increase fuel costs. Consequently, in large cities, local markets can be small and multiple geographic markets may exist.

23.     Martin Marietta owns and operates two rail yards that serve Dallas County and portions of surrounding counties (hereinafter referred to as the "Dallas area").  Customers with plants or jobs in the Dallas area may, depending on the location of their plant or job sites, also economically procure Texas DOT-qualified aggregate from two rail yards operated by Texas Industries and from one competitor's quarry located in Bridgeport, Texas.  Other quarries cannot compete successfully on a regular basis for customers with plants or jobs in the Dallas area because they are too far away and transportation costs are too great.

24.     Customers likely would be unable to switch to suppliers outside the Dallas area to defeat a small but significant price increase.  Accordingly, the Dallas area is a relevant geographic market for the production and sale of Texas DOT-qualified aggregate within the meaning of Section 7 of the Clayton Act.

**D.      Martin Marietta's Acquisition of Texas Industries is Anticompetitive**

25.      Vigorous competition between Martin Marietta and Texas Industries on price and customer service in the production and sale of Texas DOT-qualified aggregate has benefitted customers in the Dallas area.

26.      The competitors that could constrain Martin Marietta and Texas Industries from raising prices on Texas DOT-qualified aggregate in the Dallas area are limited to those who are qualified by the Texas DOT to supply aggregate and can economically rail or truck the aggregate into the Dallas area.  Currently only one other supplier of Texas DOT-qualified aggregate consistently can sell aggregate into the Dallas area on a cost-competitive basis with Martin Marietta or Texas Industries.

27.      The proposed acquisition will eliminate the competition between Martin Marietta and Texas Industries and reduce from three to two the number of suppliers of Texas DOT-qualified aggregate in the Dallas area.  Further, the proposed acquisition will substantially increase the likelihood that Martin Marietta will unilaterally increase the price of Texas DOT-qualified aggregate to a significant number of customers in the Dallas area.

28.      The response of other suppliers of Texas DOT-qualified aggregate will not be sufficient to constrain a unilateral exercise of market power by Martin Marietta after the acquisition.

29.      For certain customers, a combined Martin Marietta and Texas Industries will have the ability to increase prices for Texas DOT-qualified aggregate.  The combined firm could also decrease service for these same customers by limiting availability or delivery options.  Texas DOT-qualified aggregate producers know the distance from their own quarries or yards and their competitors' yards or quarries to a customer's job site.  Generally, because of transportation

costs, the farther a supplier's closest competitor is from a job site, the higher the price and margin that supplier can expect for that project. Post-acquisition, in instances where Martin Marietta and Texas Industries quarries or yards are the closest locations to a customer's project, the combined firm, using the knowledge of its competitors' locations, will be able to charge such customers higher prices or decrease the level of customer service.

30.     Further, Martin Marietta's elimination of Texas Industries as an independent competitor in the production and sale of Texas DOT-qualified aggregate in the Dallas area likely will facilitate anticompetitive coordination among the remaining suppliers. Texas DOT-qualified aggregate that meets a specific standard is relatively standard and homogenous, and producers often estimate competitors' output, capacity, reserves, and costs. Given these market conditions, eliminating one of the few Texas DOT-qualified aggregate suppliers is likely to further increase the ability of the remaining competitors to coordinate successfully.

31.     The transaction will substantially lessen competition in the market for Texas DOT-qualified aggregate in the Dallas area, which is likely to lead to higher prices and reduced customer service for consumers of such products, in violation of Section 7 of the Clayton Act.

**E.     Difficulty of Entry**

32.     Timely, likely, and sufficient entry in the production and sale of Texas DOT-qualified aggregate in the Dallas area is unlikely, given the substantial time and cost required to open a quarry or rail yard.

33.     Quarries are particularly difficult to locate and permit. Locating a quarry may take as long as four years, particularly when seeking suitable sites with rail access. Once a location is chosen, obtaining a permit to open a new quarry in Texas is difficult and time-

consuming.  Aggregate producers have spent over two years successfully obtaining permits and also have failed to obtain quarry permits on multiple occasions.

34.     Location is also essential for a rail-served quarry, so that the aggregate can be directly loaded on the trains for transportation to the rail yard.  If the quarry is not located on a rail line, the aggregate must be transported by truck, which can eliminate the transportation cost advantage of using rail.  Additionally, if the haul from the quarry to the rail yard is not a "single line" haul, with only one railroad carrier, the cost of the multi-line haul can diminish some of the cost advantage associated with moving aggregate by rail.

35.     Establishing a rail yard is difficult and may take several years in addition to the time necessary to locate, permit and open a quarry.  To achieve the economies necessary to be competitive in the Dallas area, rail yards must be large and able to handle large amounts of aggregate.  Obtaining the large parcels of land and permits necessary to locate a rail yard in the Dallas area is difficult, and the cost of obtaining the land and building the rail yard would be considerable.  The combined cost of permitting and opening both a new rail-served quarry and a new rail yard in the Dallas area could exceed $50 million.

36.     Because of the cost and difficulty of establishing a quarry and a rail yard, entry will not be timely, likely or sufficient to mitigate the anticompetitive effects of Martin Marietta's proposed acquisition of Texas Industries.

## V.     VIOLATION ALLEGED

37.     Martin Marietta's proposed acquisition of Texas Industries likely will substantially lessen competition in the production and sale of Texas DOT-qualified aggregate in the Dallas area, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

38.     Unless enjoined, the proposed acquisition likely will have the following anticompetitive effects, among others:

(a)     actual and potential competition between Martin Marietta and Texas Industries in the  market for the production and sale of Texas DOT-qualified aggregate in the Dallas area will be eliminated;

(b)     prices for Texas DOT-qualified aggregate likely will increase and customer service likely would decrease;

(c)     the potential for unlawful anticompetitive coordination between remaining competitors in the Dallas area likely will be increased.

## VI.     REQUESTED RELIEF

39.     Plaintiffs request that this Court:

(a)     adjudge and decree that Martin Marietta's acquisition of Texas Industries would be unlawful and violate Section 7 of the Clayton Act, 15 U.S.C. § 18;

(b)     preliminarily and permanently enjoin and restrain the Defendants and all persons acting on their behalf from consummating the proposed acquisition of Texas Industries by Martin Marietta, or from entering into or carrying out any other contract, agreement, plan, or understanding, the effect of which would be to combine Martin Marietta with Texas Industries;

(c)     award Plaintiffs their costs for this action; and

(d)     award Plaintiffs such other and further relief as the Court deems just and proper.

FOR PLAINTIFF UNITED STATES OF AMERICA:

William J. Baer
Assistant Attorney General

David I. Gelfand
Deputy Assistant Attorney General

Patricia A. Brink
Director of Civil Enforcement

Dated:  June 26, 2014

Maribeth Petrizzi (D.C. Bar #435204)
Chief, Litigation II Section

Dorothy B. Fountain (D.C. Bar #439469)
Assistant Chief, Litigation II Section

Jay D. Owen
Frederick H. Parmenter
James L. Tucker
Attorneys
United States Department of Justice
Antitrust Division
450 Fifth Street, N.W., Suite 8700
Washington, D.C.  20530
(202) 307-0620

FOR PLAINTIFF STATE OF TEXAS:


GREG ABBOTT
Attorney General

DANIEL HODGE
First Assistant Attorney General

JOHN B. SCOTT
Deputy Attorney General for Civil Litigation

JOHN T. PRUD'HOMME
Chief, Consumer Protection Division

KIM VAN WINKLE
Chief, Antitrust Section
Consumer Protection Division

_____
Mark A. Levy
Assistant Attorney General
Texas Bar No. 24014555
300 W. 15th Street, 7th Floor
Austin, Texas 78701
Ph: 512-936-1847
Fax: 512-320-0975
Mark.Levy@texasattorneygeneral.gov


Dated: June 26, 2014